[Civ. No. 28051.   Second Dist., Div. Two.   Oct. 25, 1965.]

ROBERT D. EVANS, JR., Plaintiff and Appellant, v. RIVERSIDE INTERNATIONAL RACEWAY et al., Defendants and Respondents.

William Barnett Spivak and William Barnett Spivak, Jr., for Plaintiff and Appellant.

O'Melveny & Myers, Rodney K. Potter and Donald M. Wessling for Defendants and Respondents.

HERNDON, J.—Plaintiff appeals from a judgment in favor of defendants and respondents. This judgment recites that "The Court having made its Pre-Trial Conference Order, and having therein determined that there is no triable issue of fact . . .", a judgment for respondents should be entered. In entering this judgment, the trial court relied upon *Taylor* v. *S & M Lamp Co.*, 190 Cal.App.2d 700, 706-707 [12 Cal. Rptr. 323].

By his complaint, appellant Robert D. Evans seeks a recovery of damages for breach of contract and declaratory relief against respondent Riverside International Raceway, a corporation (formerly St. Christopher). He seeks also to recover damages for interference with his contractual rights from respondents Ford, Johnson and Lewis.

On March 24, 1960, respondent Riverside International Raceway, a corporation, then known as St. Christopher, entered into a written agreement with appellant. This agreement is in the form of a letter addressed to appellant and signed on behalf of the corporation by respondent Ford as vice president. It reads as follows: "The purpose of this letter is to reduce to writing our mutual understanding relative to Riverside Raceway.

"St. Christopher corporation is in the process of acquiring a lease on the property in question and is also acquiring all rights of the Limited Partnership known as 'Riverside International Motor Raceway,' hereinafter referred to as 'Rimra'. You are an investor-creditor of this partnership to the amount of $22,200.00.

"You represent that you are generally experienced in the field of corporate and business financing and have suggested a financing program to St. Christopher, hereinafter outlined. As a creditor of Rimra provision was being made for the purchase or payment of your position for the sum of $17,760.00.

"You propose that the present escrows that St. Christopher has with Rimra may close without reference to your position

and you will waive your claim against Rimra provided St. Christopher will make the following commitments to you:

"1. You have presented an underwriting proposal which, without elaboration of the details, provides the following for St. Christopher: (a) Sale of $1,630,000.00 7½% debentures or preferred stock due 1975; (b) Sale of 130,400 shares of common stock of $2.00 par for $260,800.00.

"The underwriting costs for debentures (or preferred stock) you fix at $163,000.00 and for the common stock at $52,160.00, or a total underwriting cost of $215,160.00, leaving a net for corporate purposes of $1,675,640.00.

"(c) The present owners of St. Christopher will have 40% of the common stock plus voting rights for the maximum period allowed by law to 11% of the common stock, thereby vesting 51% of the voting rights in the present owners. (It is to be understood that if the present owners' combined ownership of stock falls below 25% of the total outstanding stock they will lose their 11% additional voting rights. Ownership for this paragraph shall include ownership of a wife, a child or a trust established by any of the owners or of a corporation formed that holds stock of any present owner.) and (d) 25,000 shares of common stock to be assigned to underwriters.

"2. An additional part of your proposal is the acquisition of the Catherine Orraj property located north of the Raceway of approximately 125 acres for the sum of $2,300.00 per acre, $172,500.00 to be paid in cash, the balance by a 10 year trust deed.

"3. For your services your present position in Rimra is to be purchased from the funds derived from the above corporate financing for the sum of $125,000.00 and you will receive 20% of the stock of the St. Christopher corporation.

"As part of your commitment you are to propose and supervise the necessary legal and corporate steps required to accomplish your program. It is anticipated that you will proceed with this work with dispatch in order that the underwriting can go forward at the earliest date.

"If applications have not been filed with the Corporation Commissioner of the State of California and with the Security Exchange Commission within six months of the date of this letter, St. Christopher or you may withdraw from this agreement, at which time the withdrawing party shall notify the other of such withdrawal. If such notice is given by you,

then St. Christopher will be obligated within 30 days of receipt of such notice to pay you the sum of $17,760.00 plus interest at 6% from the date of this agreement. If the notice is given by St. Christopher it shall accompany said notice with the tender of $22,200.00 (without interest). On such termination neither party will have any claim or claims against the other.

''4. If you are successful in your underwriting proposal the owners of St. Christopher will use their best efforts as officers and stockholders to accomplish the following:

'' (a) To cause your election as a director, subject to the limitation that this commitment shall not endanger their control of the corporation; (b) To cause quarterly and annual financial reports to be made to stockholders; (c) To adopt a realistic dividend program within the financial capabilities of the corporation designed to strengthen the stock; and (d) To buy up debentures on the open market and to consult with you as to the procedures and which bond houses are to be used for the accomplishment of such purchases.

''The foregoing is, of course, conditioned upon acquisition of the Orraj lease and the interest of Rimra by St. Christopher. This letter is to facilitate such acquisition and to evidence your rights upon such acquisition. It is to be further understood that St. Christopher will not approve any financing plan that you may propose that will require the present owners of St. Christopher to pay any additional income tax by reason of their stock acquisition pursuant to your plan.

''If the foregoing properly sets forth your understanding of our agreement kindly so indicate by signing and returning a carbon copy of this letter and executing the release.''

Appellant alleged that he had completed his performance of all that was to be done by him to accomplish the purposes of said agreement but that the defendant corporation, as a result of the wrongful acts of the individual defendants, had breached the agreement by its failure to file applications with the Corporation Commissioner and the Securities and Exchange Commission and by repudiating and frustrating consummation of the financing plan. Thus, appellant alleged:

''For the period as provided for in said [agreement], to wit, March 24, 1960 to September 24, 1960, your plaintiff performed a large amount of work and services, all as provided for within said [agreement] and *did further secure* the services of Pacific Coast Securities Company of San Francisco, California, as broker and underwriter for the underwriting,

issuance and sale of the proposed securities to be issued as contemplated by the said agreement, and that the latter firm, Pacific Coast Securities Company was at all times *ready, willing and able* to proceed with the issuance and sale of said securities. The latter said securities firm is a licensed and registered underwriting firm, *secured through the negotiations by your plaintiff* for the purposes set forth hereinabove, and for the sale and issuance of securities as provided for in said [agreement]...." (Italics added.)

In appellant's third cause of action for declaratory relief, it is alleged: "A controversy between plaintiff and each of the defendants has arisen over plaintiff's claim that plaintiff *has the right to proceed with the issuance of stock* as set forth hereinabove and which will net the defendants' corporation the sum of $1,675,640, of which your plaintiff is entitled to 25% thereof, in addition to the sum of $125,000 for his services. Defendants' refusal to proceed with the issuance of the said public offering deprives plaintiff of a substantial legal and equitable right for which there is no other remedy than this declaratory relief action to enforce plaintiff's claims and rights under the said agreement hereinabove referred to." (Italics added.)

Appellant's complaint acknowledged that respondent corporation, at the time it declined to proceed with the public offering, had paid appellant the $22,200 provided for in the agreement. In his prayer for relief, appellant sought the following:

"1. That a declaratory judgment be rendered and entered, declaring and adjudicating the respective rights and duties of the plaintiff and each of the said defendants under the above described agreement . . . , *and further declaring that the defendants forthwith proceed with the filing of an application with the Commissioner of Corporations of the State of California and the United States Security Exchange Commission for the issuance of stock for a public offering* as hereinabove provided;

"2. For an Order or Decree of this Court, declaring that plaintiff have judgment for the sum of $125,000, together with 25% of the stock of the Riverside International Raceway corporation, *which your Court shall order and decree to be applied for and issued and sold*;

"3. For the sum of $375,000 punitive or exemplary damages;

"4. For plaintiff's costs and disbursements necessarily incurred herein; and

"5. For such other and further relief as to your Honorable Court may appear meet, proper and just in the premises." (Italics added.)

Following the overruling of respondent's demurrer and the denial of an initial motion for sumary judgment, the matter proceeded to the pretrial stage where the following facts were agreed upon:

"(1) On or about March 24, 1960, plaintiff and defendant Riverside International Raceway, a California corporation, then known as St. Christopher, entered into the letter agreement attached to the original complaint as Exhibit A. No permit from the Commissioner of Corporations, pursuant to § 25500 of the Corporations Code, was in effect as to said corporation at such time. Plaintiff was at such time licensed as an agent of a licensed securities broker; said broker was not, however, connected with the transaction, and plaintiff was not licensed as a securities broker or securities agent of said defendant corporation, nor as a real estate broker. The underwriting proposal contemplated was a firm underwriting and not a mere 'best efforts' agreement.

"(2) Defendants Donald H. Ford, Ernest E. Johnson, and Roy G. Lewis, and each of them, were included among the 'present owners of St. Christopher' referred to in said Exhibit A, and have at all times since held ownership interests. No other defendants have been served except defendant Riverside International Raceway.

". . . . . . . . . . . . .

"(4) No application was at any time material hereto filed with the Commissioner of Corporations of the State of California or with the Securities and Exchange Commission for a permit to issue and sell securities to the public or for the registration of any securities of defendant Riverside International Raceway.

"(5) On or about September 28, 1960, defendants caused an application to be filed with the Commissioner of Corporations of the State of California, pursuant to which said Commissioner, on or about October 14, 1960, issued to defendant Riverside International Raceway a permit for the issuance of its stock, . . .

"(6) On or about October 20, 1960, defendant Ernest E. Johnson on behalf of defendant Riverside International Race-

way mailed to, and there was received by plaintiff, a letter,
. . . Enclosed with said letter was a check of defendant River-
side International Raceway in the sum of $22,200 payable to
plaintiff, . . .

"(7) On or about October 27, 1960, plaintiff caused said
check to be certified by Union Bank, and said check was there-
after and on or about October 28, 1960 cashed by plaintiff.
The proceeds of said check in the sum of $22,200 were received
and retained by plaintiff.''

Respondents at the pretrial stage contended that there were
no triable issues of fact in the case ''because (1) the agree-
ment calls for plaintiff to render services as a securities broker
or agent of defendant corporation and as a real estate broker,
and he was not licensed to do so, and (2) Exhibit A to the
complaint [the above quoted agreement], which is the sole
basis for any relief, properly construed, imposed no obliga-
tion under any circumstances upon defendant Riverside Inter-
national Raceway in excess of the obligation to pay plaintiff
$22,200 in the event it did not carry out the public financing
proposal referred to in the agreement.''

■ The trial court sustained these contentions and granted
a ''summary judgment'' in the manner heretofore indicated.
We regard this disposition of the case as correct and within
the spirit of the suggestion made to pretrial judges in *Taylor*
v. *S & M Lamp Co., supra,* 190 Cal.App.2d 700, 706-707.
That is to say, once it had been established that appellant was
not licensed as a securities broker or agent of defendant cor-
poration as required by sections 25005, 25006 and 25700 of
the Corporations Code,[1] it became clear that appellant had

---

[1]Section 25005 of the Corporations Code reads as follows: '' 'Agent'
includes every person or company employed or appointed by a company,
broker, or any other person, who, within this State, either as an em-
ployee or otherwise, for a compensation, sells, offers for sale, negotiates
for the sale of, or takes subscriptions for, any security.''

Section 25006 of the Corporations Code reads as follows:

''(a) 'Broker' includes every person or company, other than an agent,
who, in this State, engages either wholly or in part in the business of
selling, offering for sale, negotiating for the sale of, or otherwise dealing
in, any security issued by others, including all securities of the classes
listed in Section 25100, or of underwriting any issue of such securities,
or of purchasing such securities with the purpose of reselling them, or
of offering them for sale to the public.

''(b) However, 'broker' does not include a bank subject to the super-
vision of the Superintendent of Banks of the State of California or of
the Comptroller of the Currency of the United States, or the following,
or any agent or agency of any of the following: the United States of
America or any territory or insular possession thereof, or the District of

failed to state a cause of action entitling him to relief and it would have defeated the purposes of pretrial to pass the matter along to the trial court for its subsequent determination and disposition.

It is well settled in California that one acting as a securities broker must be licensed so to do in order that he may recover agreed compensation for services rendered. (*Rhode* v. *Bartholomew*, 94 Cal.App.2d 272, 275 et seq. [210 P.2d 768].) Furthermore, one who negotiates a sale for the owner of stock must be licensed as his agent even though the owner himself would not be required to be licensed to make the sale personally. (*Owen* v. *Off*, 36 Cal.2d 751, 752-753 [227 P.2d 457].) This rule is equally applicable even though the agent conducts only a single or isolated transaction. (*Owen* v. *Off, supra,* 36 Cal.2d at pp. 755-756.)

Appellant, however, contends that despite his several averments to the contrary in his complaint and in his affidavit filed in opposition to respondents' initial motion for summary judgment, nevertheless the court should have determined that a triable issue of fact existed as to whether he would *have had to act* as a broker or agent in order to fulfill his duties under the agreement. He relies upon such cases as *Nongard* v. *Scott,* 176 Cal.App.2d 650 [1 Cal.Rptr. 526]; *Freeman* v. *Jergins,* 125 Cal.App.2d 536 [271 P.2d 210]; *Dougherty* v. *Cross,* 65 Cal.App.2d 687 [151 P.2d 654]. Such reliance is misplaced.

These cases merely determined that when a person has contributed certain services in connection with a sale of stock *that in fact has been consummated,* he may recover the agreed compensation therefor when the services he has contributed did not amount to acts for which licensing was required under the applicable provisions of the Corporations Code. By no reasonable interpretation could it be said that these cases are authority for the proposition that one who is not acting as a licensed agent or broker can compel the consummation of a sale or receive his agreed compensation because he has "found" someone who is "ready, willing and able" to complete the sale.

---

Columbia, or any state, territory, county, or municipality, or taking district therein.''

Section 25700 of the Corporations Code reads as follows:

''No person or company shall act as an agent or broker until it has first applied for and secured from the commissioner a certificate, then in effect, authorizing it so to do.''

In his briefs filed herein, appellant makes the following argument: "Defendants have seized upon Plaintiff's contact with underwriters, and based thereon have constructed their argument that he is a securities agent or broker. This contact could render [appellant] no more than, in the words of Professor Loss: 'The ordinary "finder" who receives a fee from either the issuer or the underwriter or both for bringing them together . . .' 1 Loss, *Securities Regulation*, p. 555 (2nd Ed. 1961)."[2]

The difficulty with this line of argument is that it is equally destructive of appellant's cause of action. If appellant was to act in no greater capacity than that of a "finder," he has no standing to insist that respondents deal with the party he has "found." Neither may he receive the agreed compensation by attempting to prove that if they *had dealt* with the designated party, they would have reached an agreement. The right to recover agreed compensation when a person who is "ready, willing and able" to enter into a contract has been found within a specified period is a right accorded only to a broker (9 Cal.Jur.2d, Brokers, §§ 65, 75; Rest. 2d Agency, § 445, and Comments thereon, pp. 345-351), and not to a "finder."[3] This result is inevitable.

"A person is not a broker . . . where he merely brings a buyer and a seller together so that *they may make their own contract without aid from him,* but any participation, however slight, in the negotiations will bring him within the definition." (9 Cal.Jur.2d, Brokers, § 26, p. 164; cf. also, *Palmer* v. *Wahler,* 133 Cal.App.2d 705, 708-711 [285 P.2d 8]; *Freeman* v. *Jergins, supra,* 125 Cal.App.2d at pp. 547-551.)

"The same distinction between a finder (who finds, inter-

---

[2]The full quotation in 1 Loss, Securities Regulation, p. 555, is as follows with the portion omitted by appellant italicized: "The ordinary 'finder' who receives a fee from either the issuer or the underwriter or both for bringing them together *is not himself an underwriter if he does not otherwise participate in the distribution. But a 'finder' who receives a part of the issue as his fee and distributes those securities may be regarded as a participant in the distribution. The Commission so held in the case of a finder who, among other things, had also given financial advice to the issuer and undertaken the formation of a selling group.*"

[3]In support of his contention that a "finder" is a recognized and valuable member of the financial community, a proposition that is not an issue here, appellant also cites *When Corporations Go Public,* Israels & Duff (1962), p. 36 et seq. However, he apparently fails to note the admonition contained therein on the subject of a finder's compensation, p. 38: "If your client is a finder you should see that somewhere along the line you get a short letter setting forth the compensation, *which is payable, by the way, only if the transaction goes through.*" (Italics added.)

ests, introduces and brings the parties together *for the deal which they themselves negotiate and consummate*) and a broker (whose duty is to bring the parties to an agreement on his employer's terms) has been noted in all the decisions dealing with the subject (see, for example, *P. W. Chapman & Co., Inc.* v. *Cornelius* (2 Cir. 1930) 39 F.2d 555, *Lindeman* v. *Textron, Inc.* (D.C.S.D.N.Y. 1956) 143 F.Supp. 955; *Kuffler* v. *List* (D.C.S.D.N.Y. 1956) 144 F.Supp. 776; *Bittner* v. *American-Marietta Co.* (D.C.E.D. Ill. 1958) 162 F.Supp. 486.) A more precise designation for a finder would appear to be an 'intermediary' or a 'middleman.'

"The services performed by finders may vary from case to case. But their distinction from the status of a broker, if the circumstances of the particular case require such a distinction to be drawn, lies in their bringing the parties together *with no involvement on their part in negotiating the price or any of the other terms of the transaction.* Of course, with respect to real estate, commissions are payable only to a licensee and only when he produces a buyer who agrees to seller's terms, unless otherwise expressly agreed." (Italics added.) (*Ames* v. *Ideal Cement Co.,* 37 Misc.2d 883 [235 N.Y.S.2d 622, 625]. Cf. also, *Davidson* v. *Robie,* 345 Mass. 333 [187 N.E.2d 371, 374]; *Jackson* v. *New Orleans Board of Trade,* 207 La. 571 [21 So.2d 731, 736]; *Cray, McFawn & Co.* v. *Hegarty, Conroy & Co.* (D.C.S.D.N.Y. 1939) 27 F. Supp. 93, 97.)

■ Clearly, then, a "finder" may not compel the parties to come together and negotiate a contract, and, being unable to enter into the negotiations himself, he cannot, without altering his status to that of a broker, establish that as a result of his own negotiations the party found by him could be shown to have been "ready, willing and able" to perform as desired by his promisor. Further, one who has no greater rights than those of a "finder" cannot be heard to complain if the party offering him the opportunity to act as such thereafter changes his mind and determines to proceed in another and different fashion.

■ Applying these general rules to the agreed facts in the instant case, it is apparent that if appellant is no more than a "finder," as he contends, he has no right to compel respondent to proceed with the public stock sale tentatively set forth in their agreement nor may he collect the compensation to which he would have been entitled if respondents had proceeded to consummate the proposed public stock sale them-

selves. Therefore, under appellant's own interpretation of the agreement, he would be entitled to receive only the approximately $4,000 additional payment provided for therein in the event that respondents gave notice of their refusal to proceed with the public stock sale. Since he admittedly has been paid the agreed $22,200, no facts that might possibly establish his cause of action remain to be resolved.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.