Herbert L. HUTNER, Plaintiff-Appellant,

v.

David J. GREENE, David J. Greene and Company, Jerome L. Greene, and Alan I. Greene, as Executor of the Estate of David J. Greene, Deceased, Defendants-Appellees.

No. 550, Docket 83-7751.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1984.

Decided May 8, 1984.

Jerome Kowalski, New York City (Jeffrey P. Meyer, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, on the brief), for plaintiff-appellant Herbert L. Hutner.

Gilbert S. Edelson, New York City (Nadia C. Adler, Christopher S. Petito, Rosenman Colin Freund Lewis & Cohen, New York City, on the brief), for defendants-appellees David J. Greene and Co. and Alan I. Greene, as executor of the estate of David J. Greene, deceased.

Jerome L. Greene, defendant-appellee pro se.

Before NEWMAN and WINTER, Circuit Judges, and MacMAHON, District Judge.*

WINTER, Circuit Judge:

Plaintiff Herbert L. Hutner appeals from Judge Carter's grant of summary judgment for the defendants and dismissal of

---

* The Honorable Lloyd F. MacMahon of the United States District Court for the Southern District of New York, sitting by designation.

his complaint on the ground that the contract he seeks to enforce lacks a material term under New York law.

We affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## BACKGROUND

Since the district court granted defendants' motion for summary judgment, we state the facts in the light most favorable to Hutner.

This litigation arose out of the settlement of an earlier dispute concerning the future of C.I. Realty Investors ("C.I. Realty"), a Massachusetts real estate investment trust whose shares were traded at relevant times on the New York Stock Exchange. A controlling interest in C.I. Realty was owned by City Investing Company ("City Investing"), but by the end of 1978, David J. Greene and Company, ("Greene & Co."), a New York limited partnership in the investment banking field, controlled about 9% of the shares of C.I. Realty. A group of C.I. Realty shareholders, including David Greene, the general partner of Greene & Co., and Jerome Greene (no relation to David Greene), believed that C.I. Realty should be liquidated. To that end they formed a shareholders' group to wage a proxy fight to unseat C.I. Realty's management, an effort opposed by City Investing.

Hutner, a resident of California, engages in various investment activities, including investing for his own account and facilitating the purchase and sale of businesses by others. Hutner became aware of the C.I. Realty dispute sometime in late 1978. Hutner was acquainted with both David Greene and the officers of City Investing and developed the idea of bringing the two sides together with a view to inducing one to buy out the other's stake in C.I. Realty. After David Greene asked Hutner to arrange a meeting between the two sides, Hutner broached the proposal to David Brown, City Investing's general counsel, who expressed a willingness to meet with David Greene. Accordingly, Hutner arranged such a meeting, which was attended by him, David Greene and Brown on January 5, 1979 in Palm Springs, California.

At the meeting, the participants discussed both a sale of City Investing's C.I. Realty stock to Greene & Co. and a sale of Greene & Co.'s C.I. Realty stock to City Investing. During the discussions, Brown expressly stated that if any such transaction were consummated, City Investing would not pay Hutner a finder's fee for his role in having brought the two sides together. Hutner then turned to David Greene and indicated that if a purchase or sale of the kind under discussion took place and involved parties represented by David Greene, he would "expect to receive a normal fee for [his] services." David Greene's response was, "[w]e will take care of you." No formal agreement on such a fee was ever executed, however.

A direct transaction between Greene & Co. and City Investing never materialized, although following the meeting Hutner did pass information, offers and counteroffers between City Investing and David Greene. Meanwhile, Jerome Greene, who was also in frequent contact with David Greene about possible transactions involving the purchase or sale of C.I. Realty stock, contacted George Scharffenberger, chief executive officer of City Investing, to discuss a possible sale of City Investing's shares in C.I. Realty. After initially declining interest, Scharffenberger began negotiations with Jerome Greene regarding such a sale. In the course of these negotiations David Greene obtained from Hutner Scharffenberger's weekend telephone number, which he gave to Jerome Greene. Scharffenberger and Jerome Greene ultimately agreed that City Investing would sell its C.I. Realty stock, and Jerome Greene set out to find purchasers for it. Such purchasers, including Jerome Greene himself, were eventually located, and the sale of City Investing stock in C.I. Realty went forward in July, 1979. Hutner's involvement in the discussions between City Investing and Jerome Greene was limited to providing Scharffenberger's telephone number.

Hutner's complaint, filed in July, 1981, asserted two alternative claims for relief.[1] In the first, a claim based on express contract, Hutner alleged that the defendants had breached an agreement to pay Hutner a finder's fee in the event a purchase or sale of C.I. Realty stock between City Investing on the one hand and David J. Greene and other investors on the other occurred. In the second, a claim based on *quantum meruit*, Hutner alleged that he was entitled to compensation for finder's services rendered to the defendants in connection with the sale of City Investing stock in C.I. Realty. Identical damages were sought under the two theories of liability—*viz.* $237,981, a sum derived from the "Lehman formula," which is alleged by Hutner to be widely used in investment banking circles in the calculation of finder's fees.[2] Federal jurisdiction was based on diversity of citizenship.

After extensive discovery, Judge Carter granted the defendants' motion for summary judgment. *Hutner v. Greene*, 572 F.Supp. 49 (S.D.N.Y.1983). Applying New York choice of law rules, he concluded that a New York court would apply New York substantive law to every issue raised in the complaint. Judge Carter then dismissed the entire action, holding that, because the contract made between Hutner and David Greene lacked a term fixing the price, it was unenforceable.

This appeal followed.

## DISCUSSION

 Given the interstate nature of the transaction in question, we must determine which state's law governs the alleged contract between Hutner and David Greene. As a federal court sitting in a diversity case, we of course apply the choice of law rules of the state in which the case was brought, *Klaxon Co. v. Stentor Electric Manufacturing Co. of North America*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), in this case New York. New York courts apply a "paramount interest" test to choice of law issues involving contractual disputes. Under such a test, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969), *citing Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968). Applying this test, we conclude that a New York court would apply New York law to the express contract claim. David Greene and Jerome Greene were New York residents, Greene & Co. is a New York limited partnership and Jerome Greene is a practicing New York attorney. More important, the sale of City Investors' C.I. Realty stock to Jerome Greene and others was negotiated in New York, and the stock purchase agreements expressly purport to be governed by New York law. Such contacts implicate New York's interest in protecting its position as a national business capital attractive as a location for the negotiation of corporate control transactions of the kind in issue here. We thus conclude that a New York court would find that New York has the paramount interest in the application of its law to the Hutner-David Greene contract, which was allegedly the procuring cause of the negotiations which ultimately

1. In addition to the present defendants, the complaint was filed against six of the seven purchasers of the C.I. Realty stock sold by City Investing. The parties stipulated to a dismissal with prejudice of the claims against these purchasers (with the exception of Jerome Greene) after discovery had begun.

 Since the filing of the complaint David J. Greene has died, and by stipulation Alan I. Greene, as executor of his estate, has been substituted.

2. According to the Lehman formula, a finder is paid 5% of the first $1,000,000 of the value of the transaction for which he is to be compensated, 4% of the second $1,000,000, 3% of the third $1,000,000, 2% of the fourth $1,000,000, and 1% of the balance. Hutner alleges that the total price obtained by City Investing for its C.I. Realty stock was $13,079,850; applying the Lehman formula to this sum yields $237,981.

bore fruit in New York. To apply California law solely on the ground that the contract was made in Palm Springs would be tantamount to adopting a *lex loci* rule which has been explicitly rejected by New York courts. *See Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954).

■ Turning to the merits, we agree with Judge Carter that under New York law Hutner's express contract claim must be dismissed on the ground that it lacked a material term. Hutner concedes that the contract lacked a price term, absence of which ordinarily would render the contract unenforceable. He contends, nevertheless, that the evidence proffered on custom and usage in the investment banking community raised a triable issue of fact as to whether Hutner and David Greene had an understanding that Hutner would be compensated according to the Lehman formula.

■ The custom and usage evidence offered by Hutner, however, was not sufficient to create a triable issue. It consisted solely of an affidavit by one Walter Miller, an officer in a New York investment firm, which stated that the Lehman formula "is often used as a basis for the negotiation of finder's fees." Under New York law, however, custom and usage evidence must establish that the omitted term is "fixed and invariable" in the industry in question. *Belasco Theatre Corp. v. Jelin Productions, Inc.,* 270 A.D. 202, 205, 59 N.Y.S.2d 42, 45 (1945). By the very terms of Miller's affidavit, the Lehman formula is only frequently, rather than invariably, used, and Miller's opinion that parties to a transaction such as the sale of the C.I. Realty stock would employ the Lehman formula without modification does not supply the certainty required by New York law. The express contract claim was thus properly dismissed.

■ However, Hutner's *quantum meruit* claim is not defeated by the absence of an enforceable contract; indeed, it proceeds on the assumption that Hutner lacks an enforceable contract. Defendants argue that the *quantum meruit* claim should be dismissed on the independent ground that it is barred under the New York Statute of Frauds.[3] We disagree. That statute explicitly exempts attorneys at law in New York from its requirement of a writing for agreements of the kind at issue. N.Y.Gen. Oblig.Law § 5–701 a(10) (McKinney 1978). It is true that Hutner, although admitted to practice in New York, has not practiced law in New York or anywhere else for almost fifty years. Nevertheless, the New York Court of Appeals has declined to construe this exemption narrowly and has thus held that an attorney need not enjoy the attorney-client relationship with the parties from whom he seeks compensation in order to avail himself of the statutory exemption. *Rever v. Kayser-Roth Corp.,* 29 A.D.2d 920, 290 N.Y.S.2d 154, *aff'd,* 26 N.Y.2d 652, 308 N.Y.S.2d 384, 256 N.E.2d 540 (1970). Absent some indication from the New York courts or legislature that a functional rather than literal interpretation is to be applied, we decline to read the words "attorney at law" to cover some members of the New York bar and not others. We conclude, therefore, that New York's Statute of Frauds does not bar Hutner's *quantum meruit* claim.

■ Apparently anticipating this conclusion, the parties have extensively briefed the question of whether Hutner is barred from recovery because of his admitted failure to secure a license required by California law prior to employment as a "broker-dealer." Such a broker, defined by the relevant statute as "any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account," Cal.Corp. Code § 25004, must have a license before "induc[ing] or attempt[ing] to induce the purchase or sale, of any security in this state." *Id.* California brokers who negotiate transactions in securities but lack such a license have no enforceable right under California law to compensation either un-

---

**3.** A New York court would apply New York law to the quantum meruit claim for the same reason that it would apply New York law to the contract claim. *See supra.*

der a contract, *quantum meruit* or other legal theory. *See, e.g., Rhode v. Bartholomew*, 94 Cal.App.2d 272, 210 P.2d 768 (1949).

■ We agree with the appellees that a New York court would apply California law in determining whether Hutner was required to obtain such a broker's license. This conclusion is in no sense inconsistent with our earlier holding that New York law should be applied to other aspects of the contract dispute between Hutner and David Greene. Under the doctrine of depecage, which is often applied by New York courts, *Holzsager v. Valley Hospital*, 482 F.Supp. 629, 634 n. 4 (S.D.N.Y.1979), "the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues." Von Mehren, *Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology*, 88 Harv.L.Rev. 347, 356 n. 24 (1974). At least two distinct issues are present here—the meaning of the contract between Hutner and David Greene and the duties imposed on Hutner, a California resident, by California law. As with choice of law generally, New York courts applying depecage determine what law to apply to a specific issue by resort to the paramount interest test. *See, e.g., Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y. S.2d 743, 191 N.E.2d 279 (1963). It is reasonably apparent that California's legislature believes that substantial regulatory interests are served by requiring licensure of brokers who operate within its territory. New York, on the other hand, has no apparent interest in regulating the conduct of a California broker offering his services to clients in California. We therefore believe that a New York court would defer to the regulatory interest expressed in the California statute and apply California law on

the issue of whether Hutner was required to obtain a license.

■ We cannot determine on the uncontested facts, however, whether Hutner was a broker under California law. While brokers must be licensed in order to receive compensation for their services, "finders" need not be. *Tyrone v. Kelly*, 9 Cal.3d 1, 106 Cal.Rptr. 761, 507 P.2d 65 (1973). It has been stated that "[T]he distinction between the finder and the broker frequently turns upon whether the intermediary has been invested with authority or duties beyond merely bringing the parties together, usually the authority to participate in negotiations." [4] *Id.*, 9 Cal.3d at 9, 106 Cal.Rptr. at 766, 507 P.2d at 70. Putting the distinction differently, another California court has contrasted the finder, "who finds, interests, introduces and brings the parties together for the deal which they themselves negotiate and consummate," (emphasis omitted), with the broker, "whose duty is to bring the parties to an agreement on his employer's terms." *Evans v. Riverside International Raceway*, 237 Cal.App.2d 666, 675–76, 47 Cal.Rptr. 187, 193 (1965).

Whether Hutner's activities in this transaction were those of a broker, in which case his claim is barred, or those of a finder, in which case it is not, is on this record a fact-sensitive issue not amenable to summary judgment. *See Freeman v. Jergins*, 125 Cal.App.2d 536, 271 P.2d 210 (1954) (finder/broker distinction is a question of fact). By his own admission, Hutner did perform certain services, such as the transmission of "predetermined offers, counter-offers and other statements between the opposing camps" which a trier of fact might consider as evidence that Hutner took part in negotiations. On the other hand, we cannot say on this record that Hutner was "invested with authority," *Tyrone v. Kelly*, 9 Cal.3d at 9, 106 Cal.Rptr. at 766, 507 P.2d at 70, to participate in negotiations, a prerequisite to being a broker, or

---

**4.** *Tyrone v. Kelly* involved a California statute requiring real estate brokers to have licenses. This distinction is not germane, however, for California courts distinguishing finders and brokers in the real estate field routinely rely on

cases distinguishing finders and brokers in the securities field, and *vice versa. See, e.g., Tyrone v. Kelly*, 9 Cal.3d at 8, 106 Cal.Rptr. at 765–66, 507 P.2d at 69.

that as part of his relationship with David Greene he was under a "duty ... to bring the parties to an agreement on his employer's terms." *Evans v. Riverside International Raceway,* 237 Cal.App.2d at 675–76, 47 Cal.Rptr. at 193. Indeed, we cannot say with certainty that Hutner was acting on behalf of any particular individual when he performed those acts which appellees cite as proof that he was a broker under California law. Such factual questions and, if liability is established, the amount of recoverable damages, must be explored in further proceedings in the district court.

Affirmed in part, reversed in part and remanded.